# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 22, 2010

## STATE OF TENNESSEE v. DAVID NELSON MCCOY

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-A-414     J. Randall Wyatt, Jr., Judge**

---

**No. M2009-01156-CCA-R3-CD - Filed July 26, 2010**

---

The defendant, David Nelson McCoy, pled guilty to voluntary manslaughter, a Class C felony, and received a negotiated sentence of ten years, as a Range I standard offender, in the Tennessee Department of Correction. On appeal, the defendant challenges the trial court's imposition of a sentence of continuous confinement. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Dawn Deaner, District Public Defender, Jeffery A. DeVahser (on appeal), Tyler Chance Yarbro (at trial), and Jonathan F. Wing (at trial), Assistant Public Defenders, Nashville, Tennessee, for the appellant, David Nelson McCoy.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Eisenbeck, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In February 2008, a Davidson County grand jury indicted the defendant, David Nelson McCoy, for first degree murder. On March 20, 2009, pursuant to a negotiated plea agreement, he pled guilty to voluntary manslaughter and received a sentence of ten years as a Range I standard offender in the Tennessee Department of Correction. The plea agreement left the determination of the defendant's manner of serving his sentence to the trial court.

At the guilty plea hearing, the state submitted that the state's proof at trial would have been as follows:

> [T]he victim in this case, Marvin Davis, was killed on August 31st, 2007. On September 2nd[,] 2007, he was found beaten to death [lying] on the side of a rural highway near [Monmouth], Illinois. The victim at that point was identified as Marvin Davis of Nashville, Tennessee.
>
> During the investigation[,] detectives learned the identity of the defendant and confirmed that he was a truck driver. Detectives [located] GPS records for the truck that the defendant was operating and confirmed that he was in Nashville on August 31, 2007, and near [Monmouth], Illinois, on September 1st, 2007. Detectives also confirmed that the defendant had traded the truck for a newer one and obtained GPS records for the previous truck. The [d]etectives located and processed the truck for evidence locating the victim inside the truck. Detectives then monitored the GPS records of the defendant's newer truck and located him traveling through Illinois. Detectives interviewed the defendant[,] and he admitted [that] he hit the victim in the head with a hammer while parked at the Pilot Truck Stop located on West Trinity Lane, . . . in Nashville, Tennessee. The defendant claimed self-defense due to [the] victim having a knife. Detectives recovered the hammer from the new truck, but the defendant claimed to have disposed of the knife. The [d]etectives were never able to find the knife, but they were able to confirm that there was a dispute prior to Mr. Davis' death between the two of them.
>
> The autopsy in this case revealed that the victim died from blunt force trauma to his head.

At the sentencing hearing, two members of the victim's family testified that the victim's death greatly affected his family and asked the court not to grant probation.

Detective Brian Brown, of the Metropolitan Nashville Police Department,[1] testified that he was contacted by the Illinois State Police after that agency identified the victim, whom a citizen had found on the side of a rural road near Monmouth, Illinois, as Marvin Davis, a resident of Nashville, Tennessee. In the course of the investigation, detectives learned that the defendant was the last person that witnesses saw with the victim. After

---

[1] The transcript of the sentencing hearing does not reveal with what law enforcement agency Detective Brown was associated. However, the indictment listed him as "MPD," which is an acronym for the Metropolitan Nashville Police Department.

detectives learned that the defendant was a semi-truck driver, they located the truck that the defendant had been driving on the day the victim died. They discovered the victim's blood in that truck and learned that the defendant had traded that truck for another one. When investigators in Illinois found the defendant, he admitted striking the victim in the head with a hammer several times, in self-defense, while the victim was in the cab of his truck. He also admitted that he drove to Monmouth, Illinois, where he put the victim's body on the side of the road. Detectives located the hammer in the defendant's new truck.

On cross-examination, Detective Brown testified that the witnesses who saw the defendant and the victim together had been using drugs that night. He confirmed that the victim was a drug dealer. Detective Brown did not recall the witnesses indicating that there had been a dispute between the defendant and the victim.

Lovey Mitchell, the defendant's mother, testified that the defendant grew up in North Carolina. He is one of ten children. The defendant played football and basketball in high school and joined the army after graduation. When he came back to North Carolina from service, he started a family and worked as a truck driver. Ms. Mitchell testified that the defendant's friends and members of his church wrote him letters of support, which the court admitted as evidence. Ms. Mitchell said that the defendant was in jail in Tennessee for this offense for eight months before the court released him on bond, and when he came home, he seemed remorseful. Ms. Mitchell asked the court to give the defendant probation so that he could help his daughter, who was pregnant, and help Ms. Mitchell, who was in poor health.

Tina McCoy, the defendant's younger sister, testified that the defendant was a father-figure to her. She said that he was a good man who would not hurt someone unless he was threatened.

Shane Hamrick, the defendant's supervisor at Mayo Global Transportation, testified that he grew up with the defendant. He hired the defendant after the court released him on bond. Mr. Hamrick said that the defendant was "an excellent worker." He said that, if the court allowed the defendant to return to North Carolina, the company would continue employing him. Mr. Hamrick waived a day's pay in order to be at the defendant's hearing to support him.

Dominique McCoy, the defendant's twenty-one-year old daughter, testified that she was close to her father. She lived with her mother for most of her childhood, including when her mother, who was in the military, was stationed in Europe. When she returned from Europe, she spent more time with the defendant. Ms. McCoy testified that she was pregnant, and the defendant was excited about being a grandfather. She said that he provided financial support for her, and she asked the court to grant him probation.

The defendant testified that he lived with his sister in Forrest City, North Carolina. He contributed to college tuition for two of his children. He said that he grew up in Forrest City and entered the army after graduating from high school. He spent three years on active duty and five in the reserve. The defendant said that he was honorably discharged. He has worked as a truck driver since 1985. He testified that drug testing was part of his job. He had done drugs "[o]n and off" in the past and hidden his drug use from his family. He stopped using drugs after killing the victim. The defendant testified that authorities charged him with abduction in Virginia and burglary in Washington, but authorities dropped those charges. He also had a disorderly conduct charge.

The defendant said that a prostitute at a truck stop introduced him to the victim, from whom he planned to buy drugs. He waited with several other people in a motel room while the victim went to buy drugs. Everyone except the defendant left the room before the victim returned. When he returned to the motel room, the victim discovered that he had purchased fake drugs and became irate. Because the defendant owed the victim $20, they walked together to the Pilot Truck Stop, where the defendant had parked his truck. He let the victim into the passenger side of his truck while he went to the back to get the money. When the defendant got the $20, the victim saw that he had more money. The victim then pulled a knife out and demanded the rest of the money. The defendant did not have a way out of the truck, so he struggled with the victim. He knew the victim was high because they "had been drinking and smoking all day earlier." The defendant testified that he hit the victim with a hammer, but he did not have any intent to kill him.

The defendant testified that authorities arrested him in September 2007. He gave a statement to police to explain himself and tried to help the police find the knife with which the victim allegedly threatened him, but he had thrown the knife into a body of water. The defendant said that he also threw a hammer into the water without realizing that he threw the wrong hammer. He said that he was "high[,] . . . panicked[,] and . . . scared" when he decided to throw away the knife.

On cross-examination, the defendant testified that he did not call the police after he realized that he had killed the victim. He insisted that he laid the victim on the side of the road so that someone would find him. He recalled hitting the victim five times.

In its sentencing ruling, the trial court said that "confinement [was] necessary to not depreciate the seriousness of this and the deterrance [sic] for any other people over at that Pilot Truck Stop [who] are going to meet somebody[,] drive up to Monmouth, Illinois, put [the person] on the road and drive away . . . ." The trial court denied the defendant's request

for alternative sentencing and sentenced the defendant to ten years, with a Range I release eligibility, in the Tennessee Department of Correction.

**Analysis**

On appeal, the defendant contends that the trial court erred in sentencing him to continuous confinement. Specifically, he argues that the nature of his offense was not so shocking that it outweighed all other factors in favor of probation.

A defendant who challenges his or her sentence has the burden of proving the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). It is this court's duty to conduct a *de novo* review of the record with a presumption that the trial court's determinations are correct when a defendant appeals the length, range, or manner of service of his or her sentence. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999).

A defendant is eligible for probation if the sentence received by the defendant is ten years or less, subject to some statutory exclusions. Tenn. Code Ann. § 40-35-303(a). A defendant with a total effective sentence in excess of ten years is eligible for probation if the individual sentences imposed for the convictions fall within the probation eligibility requirements. *State v. Langston*, 708 S.W.2d 830, 832-33 (Tenn. 1986).

An especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6). A trial court must presume that a defendant sentenced to ten years or less and for whom incarceration is not a priority is subject to alternative sentencing. *State v. Byrd*, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993). It is further presumed that a sentence other than incarceration would result in successful rehabilitation unless rebutted by sufficient evidence in the record. *Id.* at 380. However, although a defendant may be presumed to be a favorable candidate for alternative sentencing, the defendant has the burden of establishing suitability for total probation. Tenn. Code Ann. § 40-35-303(b); *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Even though probation must be automatically considered, "the defendant is not automatically entitled to probation as a matter of law." Tenn. Code Ann. § 40-35-303(b), Sentencing Commission Comments; *State v. Hartley*, 818 S.W.2d 370, 373 (Tenn. Crim. App. 1991). A defendant seeking full probation bears the burden on appeal of showing the sentence imposed is

improper and that full probation will be in the best interest of the defendant and the public. *State v. Baker*, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997).

In determining whether to grant or deny probation, a trial court should consider the circumstances of the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Boyd*, 925 S.W.2d 237, 244 (Tenn. Crim. App. 1995). The defendant's lack of credibility is also an appropriate consideration and reflects on a defendant's potential for rehabilitation. *State v. Nunley*, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999).

Probation may be denied based solely upon the circumstances surrounding the offense. *State v. Ring*, 56 S.W.3d 577, 586 (Tenn. Crim. App. 2001); *State v. Hartley*, 818 S.W.2d 370, 374 (Tenn. Crim. App. 1991). However, the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree; and the nature of the offense must outweigh all factors favoring probation. *Hartley*, 818 S.W.2d at 374-75.

There is no mathematical equation to be utilized in determining sentencing alternatives. Not only should the sentence fit the offense, but it should fit the offender as well. Tenn. Code Ann. § 40-35-103(2); *State v. Batey*, 35 S.W.3d 585, 588-89 (Tenn. Crim. App. 2000). Indeed, individualized punishment is the essence of alternative sentencing. *State v. Dowdy*, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). In summary, sentencing must be determined on a case-by-case basis, tailoring each sentence to that particular defendant based upon the facts of that case and the circumstances of that defendant. *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986).

Guidance as to whether the trial court should grant alternative sentencing or incarcerate is found in Tennessee Code Annotated section 40-35-103. Sentences involving confinement should be based upon the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103.

Under Tennessee Code Annotated section 40-35-102(6), the defendant is considered a favorable candidate for alternative sentencing because he is a standard offender with a negotiated sentence of ten years. The defendant argues that the trial court denied probation based solely on the nature of his offense, which he claims was not so shocking that it outweighed factors in favor of probation. In support of his argument, the defendant relies on *State v. Butler*, in which this court reasoned that "the fact that the death of another results from the defendant's conduct does not, alone, make the offense sufficiently violent to justify a denial of probation nor can it be viewed as sufficient evidence to overcome the presumption in T.C.A. § 40-35-102(6)." 880 S.W.2d 395, 400-01 (Tenn. Crim. App. 1994). We disagree with the defendant that the trial court denied probation solely because the defendant's conduct resulted in a death. Based on the record, the trial court considered the sentencing principles and all relevant facts and circumstances; therefore, the court's determinations are subject to a presumption of correctness. *Pettus*, 986 S.W.2d at 543-44. The defendant hit the victim at least five times, did not summon any help for the dying victim, and then drove from Nashville, Tennessee to Monmouth, Illinois, where he deposited the victim's body on the side of the road. The defendant's conduct after the victim's death was shocking; therefore, the trial court's denial of probation based on the nature of the defendant's conduct was warranted. *Hartley*, 818 S.W.2d at 374-75. Accordingly, we conclude that the defendant's sentence is appropriate, and he is not entitled to relief.

**Conclusion**

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE